# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KEELY LAURIE DELCORE, et al.,

    Plaintiffs,

v.

ERIC H. HOLDER, Jr., et al.,

    Defendants.

No. 13 CV 8266

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiffs Keely Delcore and Zoltan Szilagyi are veterinarians. They met at school and fell in love. Eighteen months later, they were married. Two years after that, their twin boys were born—Ryland and Dylan are now four years old.

Delcore is a United States citizen; Szilagyi is a citizen of Romania. When a citizen marries a non-citizen, and the couple proves to the government that their marriage is bona fide, the non-citizen can become a permanent resident. But, even if the marriage is unquestionably bona fide, the couple's petition must be denied if the non-citizen previously engaged in a "sham marriage" (meaning he got married for immigration purposes, rather than to start a life with his spouse).

Plaintiffs petitioned for Szilagyi to become a permanent resident. While the government does not question the sincerity of their marriage, it denied their petition, finding that Szilagyi's short-lived marriage to Zahra Colon in 2004 was a sham. In this suit, plaintiffs contend that the government's finding was arbitrary

and capricious. For the reasons below, plaintiffs' motion for summary judgment is granted and the government's motion is denied.

**I.     Legal Standards**

    **A. Administrative Standard and Burden of Proof**

When a United States citizen marries a non-citizen, the couple can petition the government to recognize the non-citizen as a legal permanent resident.[1] The petition will be denied if the couple fails to persuade the government that their marriage is bona fide. *Matter of Brantigan*, 11 I&N Dec. 493, 497 (BIA 1966).[2] If that happens, the couple can file a subsequent petition—perhaps after the passage of time, or with additional supporting evidence.

Separate from the couple's burden, the government must deny the petition if it finds that the non-citizen ever entered a sham marriage. All of his previous marriages can be considered, and if the government finds fraud he is forever barred from receiving immigration benefits through marriage. *Ogbolumani v. Napolitano*, 557 F.3d 729, 736 (7th Cir. 2009); 8 U.S.C. § 1154(c).

---

[1] Technically, the citizen files a petition for the non-citizen to be classified as an "immediate relative," and the non-citizen applies to change his status to that of a legal permanent resident. 8 U.S.C. §§ 1151(b)(2), 1255(a); 8 C.F.R. §§ 204.1(a)(1), 204.2(a). Those technicalities are irrelevant here, so for simplicity plaintiffs are treated as though they jointly petitioned.

[2] On behalf of the Attorney General, the petition is evaluated by the United States Citizenship and Immigration Services (part of the Department of Homeland Security), and is appealable to the Board of Immigration Appeals (part of the Department of Justice). *See* 6 U.S.C. § 271(b); 8 C.F.R. §§ 204.1, 204.2. The defendants in this case are the Attorney General and government officials in the Department of Homeland Security. Lori Pietropaoli, a named defendant, no longer holds the relevant office. PSOF ¶ 7. Under Federal Rule of Civil Procedure 25(d), Thomas Cioppa, in his official capacity, is hereby substituted for Lori Pietropaoli.

To find a marriage fraudulent, the government must identify "substantial and probative evidence" that the marriage was a sham from its inception. *Surganova v. Holder*, 612 F.3d 901, 904 (7th Cir. 2010); *Matter of Tawfik*, 20 I&N Dec. 166, 170 (BIA 1990); *Cassell v. Napolitano*, 2014 U.S. Dist. LEXIS 42766, *36–38 (N.D. Ill. 2014); *Dinh v. United States*, 2014 U.S. Dist. LEXIS 95287, *22–23 (D. Nev. 2014). There must be affirmative evidence that creates more than a "reasonable inference" of fraud. *Tawfik*, 20 I&N Dec. at 167–68; 8 C.F.R. § 204.2(a)(1)(ii). The burden is on the government, and a finding of fraud requires more than a finding that a couple failed to prove that their marriage is bona fide. *Tawfik*, 20 I&N Dec. at 167–68; *Singh v. United States*, 461 F.3d 290, 294 n.3 (2d Cir. 2006); *Smolniakova v. Gonzales*, 422 F.3d 1037, 1053–54 (9th Cir. 2005). If the government identifies substantial and probative evidence that a marriage is fraudulent, the burden shifts to the couple to show otherwise. *Matter of Kahy*, 19 I&N Dec. 803, 806–07 (BIA 1988); *see also Cassell*, 2014 U.S. Dist. LEXIS 42766 at *36–38 (citing *Brown v. Napolitano*, 391 Fed.Appx. 346, 349–51 (5th Cir. 2010)).[3]

**B. Standard of Review in this Court**

Under the Administrative Procedure Act, review is limited to the administrative record. 5 U.S.C. § 706; *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Little*

---

[3] In certain situations there is a presumption of fraud and the couple bears the burden, at the outset, of proving their marriage is bona fide. *See, e.g.*, 8 U.S.C. § 1255(e) (where the couple marries during the pendency of removal proceedings); 8 C.F.R. § 204.2(a)(1) (where a non-citizen receives permanent resident status through marriage and then, less than five years later, marries another non-citizen who seeks permanent resident status through that marriage). This case does not present such a situation.

*Co. of Mary Hosp. v. Sebelius*, 587 F.3d 849, 856 (7th Cir. 2009).[4] A court may set aside the government's decision only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). If the government "examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made" then its decision will be upheld. *Ind. Forest Alliance, Inc. v. U.S. Forest Service*, 325 F.3d 851, 858–59 (7th Cir. 2003) (internal marks omitted). "[S]o long as a reasonable mind could find adequate support for the decision, it must stand." *Ogbolumani*, 557 F.3d at 733. As applied here, if no reasonable mind could find that the record contained "substantial and probative evidence" that Szilagyi's marriage to Colon was a sham, then the government's decision was arbitrary and capricious.

## II. Facts

### A. People

The plaintiffs are Keely Delcore and Zoltan Szilagyi. Delcore is a U.S. citizen; Szilagyi is a citizen of Romania. GSOF ¶¶ 1, 6. Plaintiffs were married in March 2009. GSOF ¶ 6.

Szilagyi was previously married to Zahra Colon, a U.S. citizen. GSOF ¶ 2. They were married in February 2004. GSOF ¶ 2. Szilagyi filed for divorce in May 2006 and the couple was divorced the next month. A.R. 476–78; GSOF ¶ 5. They

---

[4] The administrative record was filed under seal. *See* [28]. Citations to the record are in the form "A.R." followed by a page number. The parties also submitted Local Rule 56.1 statements of undisputed facts. "GSOF" refers to the government's statement of undisputed facts, with plaintiffs' responses [58]. "PSOF" refers to plaintiffs' statement of undisputed facts, with the government's responses [55].

4

petitioned for Szilagyi to become a permanent resident, but the petition was denied due to their divorce. GSOF ¶¶ 3, 5. The government contends that this marriage was a sham. Plaintiffs admit that the marriage failed quickly—plaintiffs say the couple was separated by May 2004 (A.R. 91–96 ¶¶ 5–11)—but maintain that it was entered in good faith.

Erika Janky is from the same Romanian town as Szilagyi. A.R. 91–96 ¶¶ 14–16. Janky and Szilagyi have lived together at various times (both with and without other roommates, including Janky's ex-husband). A.R. 91–96 ¶¶ 14–16; A.R. 510–11. They also dated. A.R. 91–96 ¶¶ 14–16; A.R. 510. During the period relevant to this case, Janky was not a U.S. citizen. A.R. 8–9, 514, 518. The government suggests that the two were romantically involved before, during, and after Szilagyi's marriage to Colon. [47] at 4, 9. Plaintiffs say that Szilagyi did not begin dating Janky until after he and Colon had separated. [44] at 2–3.

### B. Colon's Interview

In evaluating plaintiffs' petition, the government interviewed Szilagyi's ex-wife, Zahra Colon.[5] GSOF ¶ 10. The interview occurred in September 2011—more than five years after Szilagyi and Colon were divorced, and more than seven years after plaintiffs say that Szilagyi and Colon were separated. GSOF ¶ 10. Four days after the interview, the government informed plaintiffs that it intended to deny

---

[5] Plaintiffs argue that Colon's statements are unreliable because she was taking at least four medications at the time, and may have answered "yes" when asked if she had any mental or physical handicaps that would impair her participation. [44] at 7–8. I have ignored any potential effects of medications or handicaps because, as will be seen, they would not change the result.

5

their petition because it believed the Szilagyi-Colon marriage had been a sham. GSOF ¶ 16. The government admits that Colon's interview was the "primary reason" for that determination. [54] at 5. Given the substantial weight that the government accorded Colon's interview, its details are important.

### 1. Colon's Residences

Colon moved, a lot. When asked where she lived between 2003 and 2007, she listed six separate addresses, in Illinois, Tennessee, and Florida. A.R. 491. When asked about four additional addresses, she answered, "That is where I used to live." A.R. 492.

In their 2004 immigration petition, Szilagyi and Colon said that they lived together at 2341 North Albany Avenue in Chicago. GSOF ¶ 4. But in her 2011 interview, when asked if she ever lived there, she responded, "I don't even know that address." A.R. 491.[6] Colon testified that during their marriage, Szilagyi lived "on Irving Park Road" in Chicago. A.R. 491. When asked, "Did you ever live with him?" she replied, "No. I went several times to the apartment." *Id*. Later, when asked, "Did you live with Szilagyi while you were married to him?" she answered, "No." A.R. 492.

### 2. Extramarital Romances

Colon was asked whether she had a romantic relationship with another man while she was married to Szilagyi. A.R. 491. She said no. *Id*. She was also asked

---

[6] There is no evidence that, in her 2011 interview, Colon was confronted with her 2004 statement or asked to reconcile the conflicting statements.

about Erika Janky—the woman that the government now suggests Szilagyi was romantically involved with while he was married to Colon:

> Q: Do you know Erika Janky, the woman in the photograph below? [Photograph shown.]
>
> A: Yes. She threatened me after I came back from Florida. She told me [Szilagyi] was her man and they have been together for a long time and who are you to come into our relationship. I met her in a Romanian restaurant when I was eating dinner with Szilagyi. This was about late 2005. Szilagyi told me she was her old girlfriend.
>
> . . .
>
> Q: Our investigation collected evidence that proves Szilagyi and Janky were living together from 2002 to 2008 in three different apartments, which includes the time period you were married to Szilagyi. The evidence indicates you did not live with Szilagyi, but lived at several other apartments with your children. Did you know Erika Janky and Szilagyi had a romantic relationship before, during, and after you were married to him?
>
> A: No. I found out after I got married.

A.R. 491–92.

### 3. Knowledge of Fraud

Colon was asked why she married Szilagyi, and why she thought he married her. She swore that Szilagyi did not ask her to marry him for immigration purposes. A.R. 492. She also swore that he did not give her money to marry him. A.R. 493. She said that Szilagyi appeared to be very nice, and that he told her he wanted to help her live a better life (she had previously been in a physically abusive relationship). A.R. 492. Colon had children from a previous relationship, and she said that Szilagyi spent time with them and bought them food, clothing, and presents. A.R.

7

492–93. When asked whether living apart from him made her think "something was wrong with the marriage," Colon said no. A.R. 493. Still responding to that question, she contrasted her relationship with Szilagyi with her prior (abusive) relationship, and said that she wanted to have someone love her. *Id*. But she added that "it"—presumably living apart—"should have raised red flags." *Id*.

Right after she swore that Szilagyi did not ask her to marry him for immigration purposes, Colon was asked the following questions and gave the following answers:

> Q: When did you find out Szilagyi married you for his green card?
>
> A: After we got divorced. The last time I saw him was in 2006. He left without telling me anything.
>
> Q: Do you think he married you to get his green card?
>
> A: Yes. After everything I have found out, yes.

A.R. 492.

### C. The Government's Decision

The government denied plaintiffs' petition and upheld the denial on appeal, with the following statement:

> In this matter, the sworn statement by [Colon] that she never resided with [Szilagyi] is inconsistent with the claims made by [Szilagyi and Colon] on the visa petition they submitted in order to procure him an immigration benefit. This Board agrees with the Director that the inherently reliable objective evidence supports the statement of [Colon] that she never resided with [Szilagyi]. The documentation submitted by [Delcore] in support of the contention that [Szilagyi] and [Colon] resided together is inconsistent and easily manufactured. The false statement asserting joint residence on the petition filed on his behalf by his former spouse, Ms. Zahra Colon, constitutes substantial and probative evidence documented

8

> in the file to the effect that [Szilagyi] engaged in a prior fraudulent marriage in order to procure an immigration benefit.

A.R. 14; GSOF ¶ 30.

## III. Analysis

According to the government, the "primary reason" to find fraud is Colon's statement that she and Szilagyi never lived together. [54] at 5. Indeed, the government comes close to relying solely on that statement. *See* [47] at 3–4, 8–9 (arguing that Colon's statement, and the lack of contradictory evidence, satisfies the "substantial and probative evidence" standard); [54] at 3, 5, 6 (same). That would be suspect. *See Surganova*, 612 F.3d at 905 ("We realize that in today's world husbands and wives may live in separate locations. . . . Nothing in the record indicates that the [immigration judge] was using an inflexible rule under which a marriage could never be bona fide without cohabitation. All he did was permissibly weigh the couple's living arrangement as one of several factors supporting his ultimate conclusion."). But the government mentions other reasons to support its finding of fraud: (1) Colon's beliefs about why Szilagyi married her; (2) the hinted-at romantic relationship between Szilagyi and Erika Janky; and (3) "misrepresentations" about whether Szilagyi and Colon ever lived together. Taken together, no reasonable person would conclude that these facts and inferences amount to substantial and probative evidence of fraud.

### A. Colon's Beliefs About Szilagyi's Intentions

In its opening brief, the government argued that Colon "said she believed Szilagyi married her to secure a green card." [47] at 3. But Colon was told by the

interviewer that the government had conducted an investigation that "prove[d]" certain things. A.R. 492. Colon was then asked *whether she was aware* that Szilagyi was romantically involved with Janky while he was married to Colon. *Id*. By asking whether she was aware of this "fact," the interviewer suggested it was true, instead of asking Colon whether it was true. Next, the interviewer asked Colon *when she found out* that Szilagyi married her to get his green card. *Id*. Again, the question itself suggests to Colon that Szilagyi had in fact done so. Only then did the interviewer ask, "Do you think he married you to get his green card?" Colon's answer was, "Yes. After everything I have found out, yes." *Id*. Colon was never asked what she meant by "everything [she had] found out." The administrative record does not support a finding that Colon in fact had a belief supported by personal knowledge that Szilagyi married her to get a green card.

Plaintiffs noted additional reasons to discount Colon's testimony ([44] at 8–10), and in response the government concedes that Colon's speculation about why Szilagyi married her is "somewhat irrelevant." [54] at 5. Accordingly, Colon's speculation does not support the government's finding of fraud.

### B. Suggested Romance Between Szilagyi and Janky

The government hints that while Szilagyi was married to Colon, he was romantically involved with Erika Janky. [47] at 2, 3, 4, 9. The topic came up in Colon's interview but, as mentioned above, the interviewer did not ask Colon whether Szilagyi and Janky were involved; instead, he fed her that information.[7]

---

[7] The interviewer did not mention that, six months earlier, Janky swore that the romantic relationship began in 2005–after Szilagyi and Colon had separated. *See* A.R. 510.

10

Both Szilagyi and Janky swore that they did not begin dating until after Szilagyi and Colon were separated. A.R. 91–96 ¶¶ 14–16; A.R. 510. The government has identified nothing persuasive to the contrary.[8] There is no evidence in the administrative record to support a finding that Szilagyi dated Janky while he was married to Colon.

### C. Misrepresentations Concerning Whether Szilagyi and Colon Lived Together

In their 2004 petition, Szilagyi and Colon said that they lived together. GSOF ¶ 4. Plaintiffs say that was true. [44] at 3. The government decided it wasn't, based on Colon's 2011 statement and the lack of documentary evidence on the issue. As a result, the government counted against plaintiffs both (1) Szilagyi and Colon's lack of cohabitation, and (2) Szilagyi's "false statements" about cohabitation. A.R. 14; [47] at 11; [54] at 7. False statements can be evidence of fraud, but only if there is substantial evidence that the statement is in fact false. *See Reynoso v. Holder*, 711 F.3d 199, 212–13 (1st Cir. 2013) (false statement counted against petitioner where there was an explicit finding of falsehood, supported by substantial evidence). Recall that the burden is first on the government to prove a sham marriage, not on the couple to demonstrate a bona fide marriage. Here, with so little evidence that distinguishes between whether Szilagyi and Colon lived together for a mere few

---

[8] The government also points to the fact that Szilagyi and Janky were jointly listed on the registration for a car. GSOF ¶ 13. Szilagyi says that he "cosigned" the car purchase agreement. A.R. 94 ¶ 15. There is a suggestion that Szilagyi did so because Janky's credit rating was not good enough for her to purchase the car on her own. A.R. 94 ¶ 14. Szilagyi notes that he did the same thing for a male friend (with whom no one suggests Szilagyi was romantically involved). A.R. 94 ¶ 15.

11

months, as opposed to not at all, no reasonable person could conclude that substantial evidence (namely, Colon's 2011 statement that reveals that her residency was in flux over a long period of time) supports a finding that Szilagyi made a false statement.

### D. Whether Szilagyi and Colon Lived Together

In April 2004, when Szilagyi and Colon filed their immigration petition, they said they lived together at 2341 North Albany Avenue, in Chicago. GSOF ¶ 4. But in September 2011 Colon told immigration officials that she was unfamiliar with that address and she never lived with Szilagyi. GSOF ¶ 10; A.R. 491.

Plaintiffs say that Szilagyi and Colon *did* live together, but only from February 2004 until they separated, around May 2004. [44] at 3. Colon's 2011 recollection is in fact contradicted by evidence in the record. In addition to an affidavit from Szilagyi (A.R. 46–47, 91–96), there is an affidavit from Annamaria Balagyan (A.R. 45, 97). Balagyan is a friend of Szilagyi's, who swears she visited Szilagyi and Colon "in their home at 2341 N. Albany . . . on several occasions." A.R. 45.[9] Ms. Balagyan swore that she helped Szilagyi and Colon move into the home. A.R. 45. Also in the record is an interview that the government conducted with Erika Janky, in which she testified that Szilagyi and Colon lived together while married. GSOF ¶ 14; A.R. 511.

---

[9] Balagyan submitted two affidavits because the government discounted her first because it did not specify the address at which she visited Szilagyi and Colon. [47] at 10 n.6. Even if the second affidavit is not considered, the government does not explain why the lack of an address makes it reasonable to conclude that the couple never lived together at all.

12

The record also contains documents concerning Colon's living situation after May 2004. For example, the government notes that in August 2004, Colon registered a car at a new address (at which Szilagyi never lived). [47] at 2; [54] at 8; A.R. 41. But no one contends that the couple was still together in August 2004, so Colon's address at that time is irrelevant. *Tawfik*, 20 I&N Dec. at 169–70. The car registration does not help determine whether Szilagyi and Colon lived together for a few months (as plaintiffs contend) or never at all (as the government contends).

There is evidence that Szilagyi and Colon did not live together, namely, Colon's 2011 interview. The government discounted the contrary evidence, stating it was easily manufactured. The question at this deferential stage of review is whether it would be arbitrary and capricious to conclude that this weak evidence of non-cohabitation, together with other weak evidence of speculation, hinted romance with another woman, and a claimed misrepresentation about cohabitation (without much, if any, proof of intentional lies) amounted to substantial and probative evidence of fraud.

### E. Whether the Government Identified Substantial and Probative Evidence of Fraud

The government repeatedly relies on the lack of evidence that the Szilagyi-Colon marriage was bona fide. [47] at 4, 9, 10, 11; [54] at 3, 5, 7. But because the burden does not shift to plaintiffs until the government identifies substantial and

13

probative evidence of fraud, the "lack of evidence" does not count against plaintiffs. *Kahy*, 19 I&N Dec. at 806–07.[10]

Case law illustrates what "substantial and probative evidence" of marriage fraud looks like. In *Aioub v. Mukasey*, 540 F.3d 609 (7th Cir. 2008), both the non-citizen and his wife admitted the marriage was fraudulent; also, during the marriage, the wife was romantically involved with another man, with whom she lived and with whom she conceived a child; finally, the other man testified that the marriage was fraudulent. *Id.* at 610–11. As another example, in *Ogbolumani*, 557 F.3d 729, the non-citizen paid $5,000 in exchange for the marriage; the citizen's sister testified that the marriage was fraudulent; other relatives had no knowledge of the marriage; the non-citizen continued to report himself as "single" to his employer; and most convincingly, both the non-citizen and the citizen admitted that the marriage was a sham. *Id.* at 731–32. *See also Kahy*, 19 I&N Dec. at 804 (ex-wife swore that she knew the marriage was for immigration purposes, she knowingly participated in the fraud, and she was paid $1,000 to do so).

The cases discussed in the preceding paragraph are illustrative only—they do not establish a floor; there is no rule that a finding of fraud is arbitrary and capricious if the evidence differs from that discussed above. But the government has not drawn attention to any case upholding a finding of fraud on evidence similar to

---

[10] The dearth of documentary evidence on either side is not surprising, given the short duration of the marriage and the passage of time: the government first questioned the sincerity of the Szilagyi-Colon marriage more than two years after Szilagyi was remarried, more than five years after Szilagyi and Colon were divorced, and more than seven years after plaintiffs say Szilagyi and Colon were separated.

what is present here. And in at least one other case, a court concluded that the absence of evidence about the marriage allowed a reasonable inference of fraud, but was not substantial and probative evidence of fraud. *Dinh*, 2014 U.S. Dist. LEXIS 95287 at *36. Because "substantial and probative evidence" is a higher standard than "reasonable inference," *Tawfik*, 20 I&N Dec. at 167–68; *Dinh*, 2014 U.S. Dist. LEXIS 95287 at *17, the court denied the government's motion for summary judgment and remanded the petition for re-adjudication. *Dinh*, 2014 U.S. Dist. LEXIS 95287 at *39.

The government cites *Matter of Phillis*, 15 I&N Dec. 385, 387 (BIA 1975), to argue that Colon's statement meets the "substantial and probative evidence" standard. [54] at 3. But *Phillis* hurts the government's case. In *Phillis*, the citizen spouse claimed that the couple had been living together since their marriage six months earlier. *Id.* at 385. Just two months later, he admitted that that was a lie: the couple had never lived together. *Id.* He also admitted that: he had never listed the non-citizen as his wife on any document; he had never contributed to her support; and, she was seeking a divorce. *Id.* at 386. Despite this evidence—which is more suggestive of fraud than the evidence here—the petition was denied "without prejudice to submission of a new visa petition." *Id.* at 387. The couple had not carried their burden of showing a bona fide marriage, but they could try again. *Id. Phillis* did not find fraud by substantial and probative evidence, permanently barring the non-citizen from ever obtaining immigration benefits through marriage.

15

In this case, the government's primary reason for finding fraud was Colon's statement that she and Szilagyi never lived together. Colon gave the statement more than five years after her divorce, and more than seven years after plaintiffs say the couple was separated. Around the relevant time, it appears that Colon moved nine or more times. With that background, Colon's story is not very different from plaintiffs' (that the couple lived together for a mere few months). Colon did not testify that she was in on a sham—for example that Szilagyi had asked her to marry him for immigration purposes, or had paid her. The memory of participating in such a scheme would not likely fade; further, such a statement would implicate Colon in a crime, making the statement more substantial. *See, e.g.*, *Ghaly v. INS*, 48 F.3d 1426 (7th Cir. 1995) (wife's statement that she knowingly participated in the sham constituted sufficient evidence that the marriage was fraudulent); *Garcia-Lopez v. Mayorkas*, 500 Fed.Appx. 666 (9th Cir. 2012) (same).[11]

This case comes down to the following: many years after Szilagyi and Colon separated, one of them swore that they had initially lived together for a few months, and the other swore that they never lived together. Two other witnesses (Balagyan and Janky) support plaintiffs' version, and the documentary evidence is slim and equivocal. Merely choosing to believe Colon instead of the others does not satisfy the government's burden of identifying substantial and probative evidence that the

---

[11] In contrast, Colon's statement makes clear that she thought the marriage was genuine, despite recalling that the couple lived apart. A.R. 493. The government has never suggested Colon was lying. Thus, the government's theory is that Szilagyi duped Colon into marrying him for immigration purposes, but: (1) never moved in with her (despite the risk that living apart would tip her off to the scheme), and (2) divorced her before receiving any immigration benefit.

marriage was fraudulent, and in light of that specific burden of proof, no reasonable person could reach the conclusion reached by the government here.[12]

IV. **Conclusion**

For the foregoing reasons, plaintiffs' motion for summary judgment is granted and defendants' motion is denied. The case is remanded to the Department of Homeland Security, United States Citizenship and Immigration Services, for re-adjudication of plaintiffs' petition. The government is not barred from finding, upon substantial and probative evidence, that the Szilagyi-Colon marriage was fraudulent.

ENTER:

Manish S. Shah
United States District Judge

Date: 4/20/15

---

[12] Had the government identified substantial and probative evidence of fraud, the burden would have shifted to plaintiffs to show that the Szilagyi-Colon marriage was genuine. *Kahy*, 19 I&N Dec. at 806–07. I do not reach the question of whether a decision that plaintiffs failed to meet their burden would be arbitrary and capricious.

17